[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12828 & No. 22-10135

_____

ERIC ROBERT RUDOLPH,

Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

Respondent- Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket Nos. 2:20-cv-08024-CLS,
2:00-cr-00422-CLS-TMP-1

_____

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket Nos. 1:20-cv-02726-CAP,
1:00-cr-00805-CAP-1

_____

Before WILSON, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

To avoid the death penalty, Olympic bomber Eric Rudolph pleaded guilty to six federal arson charges and four counts of use of a destructive device during and in relation to a crime of violence. As part of his plea deal, Rudolph waived the right to appeal his conviction and his sentence, as well as the right to collaterally attack his sentence in any post-conviction proceeding, including under 28 U.S.C. § 2255.

In spite of the plain language of his plea agreement, Rudolph filed two petitions for habeas corpus, seeking to vacate several of his sentences under 28 U.S.C. § 2255. Those petitions—a result of the evergreen litigation opportunities introduced by the categorical approach—asserted that his convictions for using an explosive during a crime of violence were unlawful in light of new Supreme Court precedent. Whether or not that is true, Rudolph's motions are collateral attacks on his sentences, so his plea agreements do not allow them.

## I.

### A.

Eric Rudolph committed a series of bombings in Atlanta and Birmingham between 1996 and 1998, killing two people and injuring many others. He used homemade explosives designed to maximize casualties.

His first target was the 1996 Centennial Summer Olympic Games in Atlanta. He specifically selected this location as a "good target" for his first act of domestic terrorism because "the whole world would be watching." On the night of July 26, 1996, more than 50,000 people were gathered in downtown Atlanta's Centennial Olympic Park. Unbeknownst to them, Rudolph had placed a bomb under a bench near the main stage—three metal plumbing pipes covered with more than five pounds of three-inch cut masonry nails serving as homemade shrapnel. In the early morning hours, the bomb exploded, instantly killing Alice Hawthorne, a 44-year-old woman who had come to Atlanta with her daughter to participate in the Olympic festivities. More than 100 other people were seriously injured, and a cameraman also died after suffering a heart attack during the commotion.

Six months later, Rudolph attacked his next target. He placed one bomb on the ground floor exterior wall outside the operating room of Northside Family Planning Services (an abortion clinic in Sandy Springs, Georgia), and one on the ground under some shrubbery in the corner of the parking lot. The placement of the two bombs was intentional. The first bomb

would trigger an evacuation of personnel and prompt the response of law enforcement, who would then be drawn within the blast range of the second. As planned, the first bomb badly damaged the building and the clinic. The second bomb detonated about an hour later, seriously injuring two federal agents, sending five people to the hospital, and causing hearing loss in about fifty others.

Rudolph attacked again five weeks later. This time his target was the Otherside Lounge, an Atlanta nightclub with a "largely gay and lesbian clientele." He again placed two bombs. The first injured five patrons and caused extensive property damage. As for the second, this time an Atlanta police officer noticed a suspicious backpack in the parking lot and quickly initiated "render-safe" procedures. Though the bomb exploded, no one else was hurt. Just hours later, Rudolph mailed letters to four Atlanta news outlets claiming responsibility for the bombings on behalf of the "Army of God." The letters explained his targets: the first bombs were for supporters of abortion and homosexuality, and the second bombs were for federal agents. The letters, which concluded with the phrase "DEATH TO THE NEW WORLD ORDER," also warned of more bombings against those targets in the future.

Almost a year later, Rudolph committed what would turn out to be his last bombing. This time, he targeted the New Woman All Women Health Care Clinic—another abortion clinic—in Birmingham, Alabama. He hid the bomb under some shrubbery next to the walkway leading up to the clinic. True to form, this bomb contained over five and a half pounds of nails, but this time

Rudolph used a remote-control detonator.  He waited until Robert Sanderson, a Birmingham Police Officer, was leaning over the bomb to detonate the device, killing him.  Emily Lyons, the clinic's head nurse, was seriously and permanently injured in the explosion.  Again, Rudolph sent letters to two Atlanta news outlets claiming responsibility on behalf of the "Army of God" and threatening more violence.

The next morning, Rudolph learned from a nationally televised news conference that he had been identified as a suspect in the Birmingham clinic bombing.  He fled into the mountains of western North Carolina where he remained a fugitive until his arrest in May of 2003, five years later.

**B.**

Rudolph was indicted in the Northern District of Georgia on twenty-one counts relating to the bombings.  The indictment included five counts under 18 U.S.C. § 844(i), the federal arson statute.  Section 844(i) provides that whoever "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce" shall be imprisoned for between five and twenty years, or between seven and forty years if injury results, and up to life imprisonment or the death penalty if death results.  18 U.S.C. § 844(i).  Based on those arson charges, Rudolph was also indicted on five counts of knowingly using and carrying a firearm (the bombs) during and in relation to a crime of violence (the arson) under 18 U.S.C. § 924(c).

Additionally, he was indicted under 18 U.S.C. § 844(d) on four counts of transporting an explosive in interstate commerce with the intent that it would be used to kill, injure, and intimidate individuals and to unlawfully damage property. Finally, Rudolph was charged with seven counts of willfully making threats concerning an attempt to kill, injure, and intimidate and to unlawfully damage property with an explosive in violation of 18 U.S.C. § 844(e).

The government also charged Rudolph in the Northern District of Alabama. There, the charges included one count of maliciously damaging property by means of an explosive resulting in death, in violation of 18 U.S.C. § 844(i), and one count of carrying a firearm during and in relation to that crime of violence, in violation of 18 U.S.C. § 924(c). The government also filed a notice of its intent to seek the death penalty.

Rudolph entered into simultaneous plea agreements in the Northern District of Georgia and the Northern District of Alabama on April 13, 2005. For the Georgia charges, Rudolph pleaded guilty to all five counts of arson under § 844(i) for the bombings, and to three counts of violating § 924(c) for using a destructive device during and in relation to a crime of violence. The government dropped all of the remaining counts under § 844(d) and § 844(e). As for the charges in Alabama, Rudolph pleaded guilty to both counts—the § 844(i) arson and the § 924(c) use of a destructive device in relation to that arson. In exchange, the government agreed not to seek the death penalty.

Each court entered judgment against Rudolph according to the terms of the respective plea agreements, which specified that he would be sentenced to "the maximum term of imprisonment allowed by law" for each count, except that the government agreed not to seek the death penalty.  In Georgia, Rudolph was sentenced to four life sentences—one for the § 844(i) arson charge that resulted in Alice Hawthorne's death and three for the § 924(c) charges for using an explosive device during a crime of violence. He was also sentenced to sixty years for the bombings at the Sandy Springs clinic, and another sixty years for the bombings at the Otherside Lounge.  In Alabama, Rudolph received two more life sentences—one under § 844(i) for the bombing that killed Robert Sanderson, and one for using an explosive device during that crime of violence under § 924(c).  All those sentences were to run consecutively, meaning that Rudolph would serve six consecutive life sentences, followed by 120 years imprisonment.

Both plea agreements contain the same appeal waiver provision:

> In consideration of the Government's recommended disposition, the defendant voluntarily and expressly waives, to the maximum extent permitted by federal law, the right to appeal his conviction and sentence in this case, and the right to collaterally attack his sentence in any post-conviction proceeding, including motions brought under 28 U.S.C. § 2255 or 18 U.S.C. § 3771, on any ground.

Rudolph confirmed in both courts that these waivers were
voluntary. He also affirmed in writing that he understood both his
legal rights and the plea agreements' effects on those rights—
including that the waiver would prevent him from appealing his
conviction or sentence and from challenging his sentence in any
post-conviction proceeding.

## C.

Fifteen years came and went. In June 2020, Rudolph filed
pro se motions in both the Northern District of Alabama and the
Northern District of Georgia. He sought to "vacate his 924(c)
sentences pursuant to 28 U.S.C. § 2255 in light of *U.S. v. Davis*, 139
S. Ct. 2319 (2019)." In each jurisdiction he was appointed counsel,
who then filed an amended motion and reply in Georgia, and a
reply in Alabama. These motions all made the same basic
argument: Rudolph's sentences for using or carrying a firearm
during a crime of violence were unlawful because in the wake of
*United States v. Davis*, 139 S. Ct. 2319 (2019), his arson offenses were
no longer crimes of violence under the federal statute.

Rudolph's requested relief included vacatur of the life
sentences imposed under § 924(c) and resentencing on his
remaining counts: "Mr. Rudolph respectfully requests that this
Court grant his 28 U.S.C. § 2255 motion, vacate his conviction
under 18 U.S.C. § 924(c), and set this case for a resentencing
hearing on the remaining count of conviction." Rudolph
characterized these challenges as attacks on his convictions rather

than his sentences, presumably in an attempt to avoid the bar set in his plea agreement.

Both district courts denied Rudolph's § 2255 motions. The District Court for the Northern District of Alabama first agreed that, after *Davis*, § 844(i) arson does not qualify as a crime of violence under § 924(c). But it also concluded that Rudolph's appeal waiver barred his motion, because it "is not possible to collaterally attack only a *conviction* under 28 U.S.C. § 2255, which provides an avenue to attack the defendant's *sentence*." The District Court for the Northern District of Georgia did not opine on the merits of Rudolph's argument. Instead, that court concluded that his motions were barred because he had procedurally defaulted by failing to raise the *Davis* issue sooner, or, in the alternative, because he had waived the right to collaterally attack his sentences in the plea agreement. Rudolph appealed both orders, and the cases were consolidated on appeal.

## II.

When reviewing a district court's denial of a § 2255 motion, this Court reviews questions of law de novo and factual findings for clear error. *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004). The scope and validity of an appeal waiver are reviewed de novo. *King v. United States*, 41 F.4th 1363, 1366 (11th Cir. 2022).

## III.

"A plea agreement is, in essence, a contract between the Government and a criminal defendant." *Id.* at 1367 (quotation omitted). And because it functions as a contract, a plea agreement

"should be interpreted in accord with what the parties intended." *United States v. Rubbo*, 396 F.3d 1330, 1334 (11th Cir. 2005) (collecting cases). In discerning that intent, the court should avoid construing a plea agreement in a way that would "deprive the government of the benefit that it has bargained for and obtained in the plea agreement." *United States v. Boyd*, 975 F.3d 1185, 1191 (11th Cir. 2020) (quotation omitted). But make no mistake—the government is not the only party to benefit from these deals. Defendants trade costly trials and the risk of lengthy sentences for the certainty offered by a guilty plea to a lesser set of charges. And confidence about the meaning of terms in a plea agreement helps defendants in the long run by reducing transaction costs and making plea agreements worthwhile for the government to strike. *See King*, 41 F.4th at 1367.

One common provision in such agreements is a defendant's waiver of the right to appeal his sentence or conviction. Likewise for collateral attacks, which are generally brought in a separate proceeding once the direct appeal is complete. *See, e.g., id.* at 1366. A § 2255 motion is one kind of collateral attack, enabling a prisoner who has already run the gamut of direct appeals to later claim the right to be released on separate grounds. Here, Rudolph insists that his § 2255 motions are collateral attacks on his convictions, while the government says that they are (and could only ever be) attacks on his sentences.

The government has the better of the argument. The text of 28 U.S.C. § 2255, the history of that same statute, and the habeas

corpus right that it codified, all point in the same direction: § 2255 is a vehicle for attacking sentences, not convictions. Supreme Court precedents show the same, as does Rudolph's requested relief.

## A.

We start with the plain language of § 2255, which shows that any motion brought under that provision is necessarily an attack on the movant's sentence:

> A prisoner *in custody under sentence* of a court established by Act of Congress claiming the right to be released upon the ground that *the sentence* was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose *such sentence*, or that *the sentence* was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed *the sentence* to vacate, set aside or correct *the sentence*.

28 U.S.C. § 2255(a) (emphasis added).

To begin, the statute lists four grounds on which a prisoner in custody "may move the court which imposed the sentence to vacate, set aside or correct *the sentence*." *Id.* (emphasis added). So, right from the start, the statute informs us that a motion filed under this provision challenges a sentence.

The first three clauses each offer the ability to challenge a specific problem with a sentence: (1) "that the sentence was

imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; or (3) "that the sentence was in excess of the maximum authorized by law." *Id.* The fourth is a catch-all, allowing a challenge to a sentence that (4) "is otherwise subject to collateral attack." *Id.* Unlike the earlier clauses, this fourth one lacks a subject. But the only logical inference is that this clause refers to the same subject as the last—the movant's *sentence.* Because the first three enumerated grounds for a motion relate to infirmities with the movant's sentence, and no word besides "sentence" is available to serve as the subject, the fourth clause must be limited to the same class as the first three—problems with sentences. The grammatical structure offers no room for the clause to refer to anything else.

Rudolph has no real response to this text. Instead, his argument rests on the next section of the statute, which outlines a sentencing court's responsibilities once it receives what appears to be a facially valid motion for relief. According to Rudolph, that section extends the sentencing court's habeas jurisdiction beyond sentences and into convictions. Why? Rudolph says it is because § 2255(b) "permits the reviewing court to grant relief if it 'finds that *the judgment* was rendered without jurisdiction . . . or that there has been such a denial or infringement of the constitutional rights of the prisoner as to *render the judgment vulnerable to collateral attack,'* and instructs the court 'shall *vacate and set the judgment* aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.'"

It would be remarkable for a statute authorizing a challenge on one basis to give the court the authority to offer relief for a different violation. The fact that § 2255(b) uses the word "judgment" does not change the fact that this motion is ultimately a challenge to a sentence. Again, the only "judgment" the section refers to is the one referenced in the previous section—the judgment imposing the sentence. It would make no sense for the remedies in § 2255(b) to be completely different than the ones that could be requested in the § 2255(a) motion.

A few more clues in the text resolve any residual doubt that attacks under § 2255 are on sentences. The title of a statute is not dispositive, but it can inform the text's meaning. *See Essex Ins. v. Zota*, 466 F.3d 981, 989–90 (11th Cir. 2006). Section 2255's title is one that sheds light: "Federal custody; remedies on motion attacking sentence." 28 U.S.C. § 2255. Plus, only a "prisoner in custody under sentence of a court" can invoke the statute's protections. *Id.* § 2255(a). In other words, a prisoner must still be serving a prison sentence to bring a § 2255 challenge; no motion can be filed after release, which makes perfect sense for a challenge to a sentence. Moreover, the first line of the statute says the prisoner is "claiming the right to be released" from a sentence on one of the enumerated grounds. *Id.* This provision likewise makes sense only in the context of a challenge to a sentence—not a conviction.

The text of § 2255 points to one conclusion.  These motions are collateral attacks on a movant's sentence—the exact thing that Rudolph waived the right to do.[1]

## B.

Lacking support in § 2255's text, Rudolph turns to precedent.  His primary argument is that *Davis v. United States* says that § 2255 can be used to challenge convictions rather than just sentences.  417 U.S. 333 (1974).  But neither *Davis* nor the history it cites are on Rudolph's side.

First, *Davis*.  The issue there was not whether § 2255 could be used to attack a conviction.  Instead, the Court was deciding whether a change in a circuit court's case law was enough to attack "the sentence imposed," or whether the error needed to be of a "constitutional dimension."  *Id.* at 341–43.  The majority thought a legal error was sufficient; the dissent thought habeas relief was available only to remedy a constitutional error.  So the dispute was over the available grounds for attacking a sentence under § 2255.  What the Court was *not* deciding was whether § 2255 is a vehicle for collaterally attacking sentences, convictions, or both.

───────────────

[1] Rudolph points to two decisions (one unreported) of our sister circuits, both concluding that § 2255 enables a collateral attack on a conviction separately from a collateral attack on a sentence.  *See United States v. Loumoli*, 13 F.4th 1006, 1009–10 (10th Cir. 2021); *In re Brooks*, No. 19-6189, 2020 U.S. App. LEXIS 6371, at *3 (6th Cir. Feb. 28, 2020).  Both of these decisions are under reasoned, and we are convinced that the textual and historical arguments outlined here justify departing from them.

*Davis* established that inmates have a right to attack their sentences by showing a legal-but-not-constitutional infirmity in the convictions that led to those sentences. Rudolph focuses not on this holding, but on one sentence that suggests a different implication from the case: "Nowhere in the history of Section 2255 do we find any purpose to impinge upon prisoners' rights of collateral attack upon their convictions." *Id.* at 344. This, he says, is enough to prove that § 2255 can be used to challenge not just his sentence, but his conviction too.

To start, this part of the *Davis* opinion has little to do with the Court's holding. As a rule, "a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case" is dicta. *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (quotation omitted). And dicta is "not binding on anyone for any purpose." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). Both of these points are crucial—not only to letting courts decide the cases before them, but also to avoiding the risk that stray language will take on importance in a new context that its drafters could not have anticipated.

That is also why we "cannot read a court's opinion like we would read words in a statute." *See Nealy v. Warner Chappell Music, Inc.*, 60 F.4th 1325, 1332 (11th Cir. 2023). Instead, we consider opinions in their context, including the questions presented and the facts of the case. *Id.* Here, the context shows that the Court was responding to the dissenting opinion's attempt to confine the

nature of the allowed challenge to constitutional errors—not addressing whether § 2255 motions attack convictions or sentences. *See Davis*, 417 U.S. at 343–44.  An understanding had developed that prisoners could challenge their sentences by showing that the convictions that led to them were unlawful.  And *Davis* resolved the debate about whether those infirmities needed to be constitutional ones.

Rudolph argues that we should also rely on *Davis*'s reference to the history of habeas corpus.  We have no argument there—but the history does not support his expansionary view of the statute. Section 2255 maintained the historical rule of habeas corpus as a remedy for unlawful imprisonment.

The "glory of the English law consists in clearly defining the times, the causes, and the extent, when, wherefore, and to what degree, the imprisonment of the subject may be lawful."  3 William Blackstone, *Commentaries* *133.  And though the complete origins of habeas corpus are obscured by history, the writ is naturally connected with "those clauses of Magna Carta which prohibited imprisonment without due process of law."   9 William S. Holdsworth, *A History of English Law* 111 (1926); *see also* George F. Longsdorf, *Habeas Corpus: A Protean Writ and Remedy*, 8 F.R.D. 179, 180–81 (1948).  Here too, release from an illegal sentence was understood to be the reason for habeas corpus: "The decision that the individual shall be imprisoned must always precede the application for a writ of *habeas corpus*, and this writ must always be for the purpose of revising that decision."  *See Ex parte Bollman*, 8

U.S. (4 Cranch) 75, 101 (1807).  Relief from illegal detention, in short, has long been a defining feature of the Anglo-American legal landscape.

To be sure, what qualifies as illegal detention for these purposes has broadened over time.  At the Founding, a conviction in a court of competent jurisdiction was sufficient evidence that due process had been given and imprisonment was lawful.  *See* 3 William Blackstone, *Commentaries* \*131–32.  Courts considering habeas petitions thus examined only the power and authority of the court to imprison the petitioner, *not* the correctness of that court's legal conclusions.  *See, e.g.*, *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 201–03 (1830); *Ex parte Burford*, 7 U.S. (3 Cranch) 448, 449–53 (1806).  "If the point of the writ was to ensure due process attended an individual's confinement, a trial was generally considered proof he had received just that."  *Brown v. Davenport*, 596 U.S. 118, 128 (2022).

In the latter half of the nineteenth century and into the early twentieth, however, this jurisdictional inquiry expanded into a more searching review for constitutional defects in the underlying conviction—but it did so within the original jurisdictional framework.  In short, a constitutional defect at the trial level acted to rescind the jurisdiction of that court, rendering the sentence vulnerable to attack.  So as the Court explained in *Ex parte Siebold*, a conviction under an unconstitutional law "is not merely erroneous, but is illegal and void, and *cannot be a legal cause of imprisonment*."  100 U.S. 371, 376–77 (1879) (emphasis added); *see*

*also Ex parte Lange*, 85 U.S. (18 Wall.) 163, 178 (1873) (writ granted because sentence "was pronounced without authority, and he should therefore be discharged"); *Ex parte Wilson*, 114 U.S. 417, 429 (1885) (writ granted because trial court "exceeded its jurisdiction, and he is therefore entitled to be discharged"). But the courts never wavered from understanding habeas corpus as a remedy for an illegal sentence—not a second round of appeals for the purpose of vindicating an improper conviction. *See* George F. Longsdorf, *Habeas Corpus: A Protean Writ and Remedy*, 8 F.R.D. 179, 188–90 (1948).

Enter § 2255, passed during an era of increased codification. *See generally* Guido Calabresi, *A Common Law for the Age of Statutes* (1982). The Judicial Conference of the United States recommended two bills: one intended to curb abuse of the writ, and the other jurisdictional—enabling federal prisoners to bring collateral attacks in the courts that sentenced them, rather than the courts where they were confined.[2] *United States v. Hayman*, 342 U.S. 205, 214–15

---

[2] This new habeas corpus statute offered a solution to the discrete problem that habeas corpus petitions could be filed only in the district of a prisoner's confinement. Habeas Corpus Act of 1867, ch. 28, 14 Stat. 385; *see also United States v. Hayman*, 342 U.S. 205, 212–13 (1952). That presented a problem in the modern era, with its interstate federal prison system. Relevant records remained in the original court of conviction and could be difficult to obtain, a practical difficulty magnified by the fact that most federal prisons were located in a handful of states. *Hayman*, 342 U.S. at 212–14. That meant district courts in those states were flooded with a disproportionate number of habeas petitions, "far from the scene of the facts, the homes of the witnesses *and the records of the sentencing court*." *Id*. at 214 (emphasis added).

(1952).  Indeed, the Conference underlined the fact that this second proposal (the precursor to § 2255) was about challenging *sentences*:

> This section applies only to Federal sentences.  It creates a statutory remedy consisting of a motion before the court where the movant has been convicted.  The remedy is in the nature of, but much broader than, coram nobis.  The motion remedy broadly covers all situations where the sentence is "open to collateral attack."  As a remedy, it is intended to be as broad as habeas corpus.

Comm. on the Judiciary, *Regulating the Review of Judgments of Conviction in Certain Criminal Cases*, S. Rep. No. 80-1526, at 2 (1948).

"As broad as habeas corpus" does not mean "broader than habeas corpus," which was always understood to be an attack on illegal imprisonment.  Section 2255 fundamentally remains a procedure for prisoners to challenge their sentences.  That is no less true when the method of attack is to show that a conviction was illegal.  Even then, a motion under § 2255 is "a collateral attack on the proceeding or process of detention."  George F. Longsdorf, *Habeas Corpus: A Protean Writ and Remedy*, 8 F.R.D. 179, 190 (1948).

This understanding of § 2255 pervaded the Supreme Court's entire opinion in *Jones v. Hendrix*, a recent case considering the scope of § 2255(e)'s so-called savings clause.  599 U.S. 465 (2023).  In that opinion the Court noted that "Congress created § 2255 as a separate remedial vehicle specifically designed for federal prisoners' collateral attacks on their *sentences*"; that § 2255 reroutes "federal prisoners' collateral attacks on their *sentences* to the courts

that had sentenced them"; and that § 2255 provides the "venue for a federal prisoner's collateral attack on his *sentence*." *Id*. at 473, 474, 479 (emphasis added); *see also id*. at 469, 477, 478, 490, 492. We agree.

## C.

As a practical matter, it is clear that Rudolph's § 2255 motions are exactly what his appeal waiver was intended to prevent. In fact, the waiver specifically contemplates motions under § 2255: Rudolph waived "the right to collaterally attack his sentence in any post-conviction proceeding, including motions brought under 28 U.S.C. § 2255 or 18 U.S.C. § 3771, on any ground."

Though he claims to be challenging the validity of his underlying convictions, the relief Rudolph sought in the district courts was tied entirely to his sentences. To start, he asked for the life sentences imposed for the § 924(c) convictions to be vacated. He also asserted that "because the multi-count sentence was negotiated and imposed as a package," the courts should "set the case for resentencing" and "unbundle the sentencing package of the original judgment and revisit the prison terms on the remaining counts." Rudolph thus sought to collaterally attack his sentences under § 2255—a right that he expressly waived in his plea agreement.

## D.

Alternatively, Rudolph argues that his appeal waivers are unenforceable because he did not know that he was giving up the

21-12828                Opinion of the Court                21

right to collaterally attack his convictions when he entered into his plea agreements.  If he had only known, he says, he would never have agreed to waive this right.  But as we have already shown, Rudolph's § 2255 motions are not collateral attacks on his convictions—they are collateral attacks on his sentences.

There may be mechanisms by which Rudolph can collaterally challenge his convictions, but § 2255 is not one of them. Our precedent confirms that "28 U.S.C. § 2255 was not enacted to provide the exclusive remedy for a prisoner to obtain postconviction *habeas corpus* relief in all circumstances," and that "federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law."  *United States v. Holt*, 417 F.3d 1172, 1175 (11th Cir. 2005) (quoting *United States v. Ayala*, 894 F.2d 425, 428 (D.C. Cir. 1990)).  Thus, as the government confirmed, there are "ways to collaterally attack a conviction that are not 2255 motions. Arguably, Mr. Rudolph wouldn't be prohibited from bringing those given the text of his plea agreement."  Habeas corpus may be the Great Writ, but it isn't the only writ.

### E.

In a last-ditch effort, Rudolph urges us to adopt the so-called miscarriage of justice exception to the general rule that appeal waivers are enforceable.  We have repeatedly declined to adopt that exception.  Even if we were inclined to change course here— which we are not—Rudolph would not qualify for relief for any number of reasons.

22                    Opinion of the Court                    21-12828

Our Circuit has long held that knowing and voluntary waivers of the right to appeal are enforceable, and we have "never adopted a general 'miscarriage of justice' exception to the rule that valid appeal waivers must be enforced according to their terms."[3] *King*, 41 F.4th at 1368 n.3.  Some of our sister circuits have adopted such an exception—overriding a valid waiver where "denying a right of appeal would work a miscarriage of justice"—but this exception has proved "infinitely variable."  *United States v. Teeter*, 257 F.3d 14, 25 & n.9 (1st Cir. 2001); *see also United States v. Andis*, 333 F.3d 886 (8th Cir. 2003) (applying the miscarriage of justice exception to an "illegal sentence").

Rudolph has suggested that we should adopt a miscarriage of justice exception and apply it to him because he is "actually innocent" of the § 924(c) crimes which charged him with using a destructive device while committing arson.  That contention is preposterous.  Rudolph argues that, for technical reasons, his arson convictions did not meet the categorical definition of a crime of violence under 18 U.S.C. § 924(c) because *someone else*, theoretically, could be convicted for setting a fire on their own property, or for committing arson with recklessness rather than intent, neither of which would qualify as violent crimes.

---

[3] Though we have not adopted the miscarriage of justice exception, we have recognized that "there are certain fundamental and immutable legal landmarks within which the district court must operate regardless of the existence of sentence appeal waivers." *United States v. Bushert*, 997 F.2d 1343, 1350 n.18 (11th Cir. 1993).  Such landmarks include, to start, the inviolability of statutory maximum sentences.

That is a far cry from actual innocence.  To establish actual innocence in the procedural default context, a prisoner must show that "it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quotation omitted).   And "actual innocence" means "factual innocence, not mere legal insufficiency." *Id.*   In cases like Rudolph's where the Government has forgone other, more serious charges in the course of plea bargaining, the petitioner must show that he is actually innocent of the forgone charges as well.[4] *Id.* at 624.

We cannot, in good conscience, seriously suggest that Eric Rudolph is "actually innocent" of using an explosive device during and in relation to a crime of violence under 18 U.S.C. § 924(c).  Let alone actually innocent of the dropped charges, which included four counts under 18 U.S.C. § 844(d) for transporting an explosive in interstate commerce with intent to kill, injure, and intimidate individuals and to unlawfully damage property, and seven counts under 18 U.S.C. § 844(e) for willfully making threats concerning an attempt to kill, injure, and intimidate and to unlawfully damage property with an explosive.  It would defy all reason to contend that he is factually, rather than (potentially) legally, innocent of that

---

[4] There has been some disagreement as to whether a petitioner must show that he is also innocent of equally serious dropped charges, in addition to more serious charges, to defend against procedural default.  *See, e.g.*, *United States v. Caso*, 723 F.3d 215, 221–22 (D.C. Cir. 2013).  Because we reject the invitation to create an exception for Rudolph either way, we refrain from weighing in on the scope of actual innocence in this context.

24                    Opinion of the Court                21-12828

crime for the purposes of habeas corpus.  We decline to create this
exception, or to apply it for Rudolph.

                        *       *       *

    Eric Rudolph is bound by the terms of his own bargain.  He
negotiated to spare his life, and in return he waived the right to
collaterally attack his sentences in any post-conviction proceedings.
We will not disrupt that agreement.  Because Rudolph's § 2255
motions are collateral attacks on his sentences, they are barred by
his plea agreement.

    **AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 12, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-12828-DD   ; 22-10135 -DD
Case Style:  Eric Rudolph v. USA
District Court Docket No:  2:20-cv-08024-CLS
Secondary Case Number:  2:00-cr-00422-CLS-TMP-1

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered
today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP
41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time
for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in
the clerk's office within the time specified in the rules. **A petition for rehearing must include
a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th
Cir. R. 35-5(k) and 40-1.

Costs
No costs are taxed.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the
Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39
and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any
objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation via the eVoucher system no later than 45 days after issuance of the mandate or
the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion